[No. E019663. Fourth Dist., Div. Two. Sept. 8, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL GUY HEATH, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.D through II.K.

698

## COUNSEL

Alisa A. Shorago, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Raquel Gonzalez and Elizabeth Voorhies, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RICHLI, J.**—Defendant was convicted by a jury of:

*Count 1:* manufacturing methamphetamine (Health & Saf. Code, § 11379.6, subd. (a));

*Count 2:* possession of a controlled substance while armed with a firearm (Health & Saf. Code, § 11370.1, subd. (a)); and

*Count 3:* possession of a deadly weapon (Pen. Code, § 12020, subd. (a)).

With respect to count 1, the jury found true two special allegations:

*Allegation 1:* defendant was personally armed with a firearm (Pen. Code, § 12022, subd. (c)); and

*Allegation 2:* a principal was armed with a firearm (Pen. Code, § 12022, subd. (a)(1).)

The court sentenced defendant to a total term of six years. Defendant argues there was: (1) insufficient evidence methamphetamine was manufactured (count 1); (2) error in instructing manufacturing includes all stages of production; (3) insufficient evidence defendant aided and abetted in manufacturing; (4) error in not instructing sua sponte that defendant had to form the intent to aid and abet manufacturing prior to or during the offense; (5) insufficient evidence defendant or any other principal was armed; (6) insufficient evidence defendant possessed methamphetamine while armed (count 2); (7) insufficient evidence defendant possessed a deadly weapon (count 3); (8) prosecutorial misconduct in misrepresenting the effect of a stipulation; (9) improper multiple punishment (Pen. Code, § 654) for being armed in count 1 and for possession of a controlled substance with a firearm in count 2; (10) improper multiple punishment in count 1 for being personally armed and for a principal being armed; (11) abuse of discretion in finding no unusual circumstances warranting probation; and (12) cumulative error.

We find insufficient evidence defendant was personally armed and therefore sustain contentions (6) and (7). Accordingly, we reverse the convictions on counts 2 and 3 and the finding that defendant was personally armed in the commission of count 1. This disposition moots contentions (9) and (10). We reject the remaining contentions and therefore affirm the judgment in all other respects.

## I

### FACTS

On December 20, 1995, about 5 p.m., police executed a search warrant at commercial premises on Ninth Street in San Bernardino. Prior surveillance had indicated an absence of typical business activity at the premises—the rear roll-up door to the service bay area was never open during the day and only occasionally open part way at night, and the front blinds were closed. Also, there was extensive foot, bicycle, and vehicle traffic in and out of the premises, increasing as the hour grew later, but without any transportation of large items.

Defendant was in the front office portion of the premises when the police came to the door. In addition to the service bay and front office area, the premises contained a bathroom and an upstairs living quarters in which the officers observed a mattress, pillows and bedding, radios, a television, heater, lights, chair, tables, and other items commonly found in living areas. Male and female clothing was also found.

Defendant said there was no one else there. He said he was just watching the premises, and did not want to be blamed for the items there. Defendant said all the items belonged to "them." He stated he did not want anything to do with what "they" were doing at the premises.

The premises had a distinctive odor associated with methamphetamine manufacture. Officers found numerous items used in, or indicative of, the manufacture of methamphetamine, including chemicals, laboratory equipment, pay-owe sheets, chemical notations, a reference book open to a page showing pseudoephedrine sources, coffee filters containing chemical residues, methamphetamine pipes, syringes, and a mirror with a white powdery substance divided into lines for inhaling. There was also a California Department of Corrections jumpsuit. Illegal drug manufacturers often use law enforcement attire to conceal their identities when moving materials to different locations.

Officers also found mail addressed to codefendant Melvin Lee Baber and an application for employment with the name Kimberly Jo Ali.[1] There was a receipt for a business license dated November 21, 1995, with a customer name of Jo Ali, as well as a fire department notice bearing the address of the

---

[1]Baber and Ali were jointly charged with defendant on all counts and allegations. Defendant and Baber were tried together, but the jury was unable to reach any verdict as to Baber. Baber was subsequently retried and convicted on all counts and allegations.

premises and the name Kimberly Jo Ali. A business registration certificate for the premises in the name of "Kim and Lee Janitorial" also was present. The names "Lee" and "Kim" also appeared frequently in books and note pads found in the premises.

The premises also contained a Social Security card and California identification card with the name "Ronald Eugene Pryor." The identification card bore a photograph of Melvin Lee Baber. The premises also contained a series of photographs of Baber and Kimberly Ali.

In a locked cabinet, the officers found a loaded .357-caliber revolver. In an unlocked drawer of the cabinet, they found a loaded .22-caliber pen pistol. The pen pistol was operable.

An investigating officer concluded methamphetamine was being manufactured on the premises using a process of ephedrine extraction. Based on observation of the premises and the items located there, a criminalist reached the same conclusion. The parties stipulated that another criminalist performed a chemical analysis of filter paper found at the premises and discovered methamphetamine, iodine, and phosphorus, which in his opinion demonstrated the manufacturing of methamphetamine was occurring. After the initial step of the process that was being used at the premises, methamphetamine is produced but is not in usable form because it is combined with hydriodic acid. Similarly, each subsequent step of the process produces methamphetamine, though it is not in usable form until the final step.

After being advised of his rights, defendant said he did not live at the premises and was "just watching the place." Defendant said he was aware drugs were being manufactured at the premises and that methamphetamine was at the premises. Defendant also said he used drugs. However, he said he was not involved in manufacturing or selling drugs and did not know how to manufacture drugs. Defendant also said he did not know there were any weapons at the premises.

## II

### DISCUSSION

#### A. *Sufficiency of Evidence of Manufacturing Methamphetamine*

■ Defendant contends the conviction on count 1 should be reversed because there is insufficient evidence methamphetamine manufacturing was occurring on the premises. He notes that only one of the substances found at

the premises was actually tested, while the investigating officer and criminalist who testified merely assumed or suggested based on the appearance of the other items that they were methamphetamine or chemicals used in its manufacture.

Had there been no other evidence than the officer's and criminalist's observations and inferences, defendant's point might have more appeal. But the other evidence supporting a conclusion that manufacturing was occurring was abundant. Viewed in light of this other evidence, the observations and inferences of the investigators, who had extensive training in the investigation of clandestine drug manufacturing operations, properly could be considered as further evidence supporting the jury's ultimate conclusion.[2]

First, as stated, the substance which was tested was found to contain methamphetamine. Defendant argues this was not substantial evidence of manufacturing because, since the substance contained no sodium hydroxide, it must have been produced during the initial "cooking" stage of the manufacturing process.[3] Defendant contends that, to be liable for manufacturing, "the defendant must be engaged in the <u>completion</u> of [the] final product, not just engaged in an initial or intermediate stage."

Defendant's position is inconsistent with two recent Court of Appeal decisions. In *People* v. *Lancellotti* (1993) 19 Cal.App.4th 809 [23 Cal.Rptr.2d 640], the defendant was convicted of manufacturing based on his ownership of a " 'boxed' " laboratory in a storage locker containing " 'virtually all' " of the equipment needed to manufacture methamphetamine. (*Id.*, at p. 812.) He argued the evidence was insufficient because the locker did not contain a piece of equipment and a chemical agent which were necessary for the final step of the manufacturing process. (*Id.*, at p. 811.)

The court expressly rejected the suggestion that the defendant had to be engaged in, or even have the necessary equipment for, the completion of the final product in order to be guilty of manufacturing. It stated: " '[T]he conduct proscribed by [Health and Safety Code] section 11379.6 encompasses the *initial* and *intermediate* steps carried out to manufacture, produce or process [a controlled substance].' " (*People* v. *Lancellotti, supra,* 19

---

[2]In view of our conclusion that the investigators' inferences were properly considered, we do not address defendant's arguments that those inferences were incompetent evidence and that his counsel was ineffective for not objecting to them.

[3]In general terms, the method of methamphetamine production being used at the premises involved heating ephedrine with hydriotic acid and red phosphorus to produce methamphetamine in an acid solution, then adding an oxidizing agent such as sodium hydroxide to produce a biphasic liquid, then crystallizing the methamphetamine with a strong acid, and finally filtering off the liquid and drying the resulting product.

Cal.App.4th at p. 813, italics added, quoting *People* v. *Jackson* (1990) 218 Cal.App.3d 1493, 1504 [267 Cal.Rptr. 841].) Similarly, the court stated: " 'The ongoing and progressive making, assembly or creation of [a controlled substance] from its component chemicals may, but does not necessarily by definition, include the culmination of the manufacturing process, the finished . . . product.' " (*Lancellotti, supra,* at p. 814.)

In *People* v. *Jackson, supra,* 218 Cal.App.3d 1493, the defendants were convicted of manufacturing PCP after police found nine buckets of a PCP precursor (PCC) dissolved in petroleum ether, and nineteen other buckets each containing a mixture of three chemicals necessary to make a grignard reagent. To complete the process, it would have been necessary to combine the dissolved PCC with the finished reagent to form PCP crystals, and then to liquefy the crystals by adding ether and lye. It would have taken about four hours for the reagent mixtures to finish reacting and about ten hours to have completed manufacturing the PCP. (*Id.,* at pp. 1500-1501.)

The defendants argued that "since the manufacturing process was interrupted by the police before the final stage of production had been reached," there was insufficient evidence to support their convictions for manufacturing. (*People* v. *Jackson, supra,* 218 Cal.App.3d at p. 1503.) As did the court in *Lancellotti,* the *Jackson* court rejected that argument, stating: "[T]he conduct proscribed by section 11379.6 encompasses the initial and intermediate steps carried out to manufacture, produce or process PCP. To require that the manufacturer actually complete the finished product, rather than be merely engaged in its completion, would give the words in the statute 'a forced and strained meaning contrary to [their] common understanding.' " (*Jackson, supra,* at p. 1504.)

Defendant seeks to distinguish *Lancellotti* and *Jackson,* and to relegate to dictum their statements that the offense of manufacturing encompasses the initial and intermediate stages of the production process. He notes that in *Lancellotti* the evidence showed only "a relatively simple step" would have been necessary to complete the process (*People* v. *Lancellotti, supra,* 19 Cal.App.4th at p. 812), and that in *People* v. *Jackson* the court found that "[t]he requisite components had already been mixed together and were bubbling and reacting" and the process "would have inevitably resulted in the finished PCP product if the police had not interceded." (*Jackson, supra,* 218 Cal.App.3d at p. 1504.) Indeed, defendant argues, *Jackson*'s statement that a defendant need only be "engaged in [the] completion" of the finished product means that "manufacturing may encompass only the final step" of the process.

We reject defendant's reading of *Lancellotti* and *Jackson.* In neither case were the defendants "engaged in" the "final step" of the manufacturing

process when the police intervened. In *Lancellotti*, in fact, the final step had not been and *could not* be taken due to the absence of the required equipment and chemical agent. And in *Jackson* the defendants still would have had to combine the dissolved PCC with the reagent and add ether and lye to liquefy the resulting crystals.

The fact that more steps may have been necessary to complete the final product in this case than in *Lancellotti* and *Jackson* is not, in our view, a meaningful basis for distinguishing those authorities. The express terms of Health and Safety Code section 11379.6 subject to liability not only one who "manufactures" a controlled substance, but also one who "compounds, converts, produces, derives, processes, or prepares" such a substance. (§ 11379.6, subd. (a).) It is evident from the Legislature's use of such all-encompassing language that it intended to criminalize all acts which are part of the manufacturing process, whether or not those acts directly result in completion of the final product.

Although it is possible to conceive of a case in which the acts undertaken are too preliminary in nature to fall within even the broad language of the statute, this is not such a case. Rather, as discussed *ante*, the parties stipulated that chemical analysis showed methamphetamine *had been produced* by the time of the search. The prosecution's criminalist confirmed that the result of the initial "cooking" stage would be methamphetamine, though not in a usable form:

"Q. So in all those—after you finish step one, even though it's in liquid, the last product, the end product of the cooking of the ephedrine and the hydriotic acid and red phosphorus, *you have methamphetamine*, correct?

"A. Yes.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"Q. But the point of my question is that at each and every one of those steps after the cooking they have methamphetamine in it, even though it does not look like the white powder spread on the mirror in neat little lines; is that correct?

". . . . . . . . . . . . . . . . . . . . . . . . . .

"A. Yes." (Italics added.)

This evidence was sufficient to permit the conclusion that Health and Safety Code section 11379.6 had been violated.

Moreover, even if the chemical analysis showing the presence of methamphetamine were not by itself sufficient, there was uncontradicted testimony that defendant admitted he was aware drugs were being manufactured at the premises. Defendant argues his admission was not substantial evidence, because " 'words of common usage do not necessarily reflect the subtle distinctions they bear before bench and bar.' " In the case defendant cites, however, the Supreme Court merely concluded a witness's affirmative answer to a leading question whether he had "stolen" a document did not establish he had the intent to remove it permanently as opposed to temporarily. (*People* v. *Kunkin* (1973) 9 Cal.3d 245, 252 [107 Cal.Rptr. 184, 507 P.2d 1392, 57 A.L.R.3d 1199].)

There is no comparable ambiguity here; defendant does not explain how the meaning of the term "manufacturing" as used in Health and Safety Code section 11379.6, subdivision (a) is materially different from the common understanding of the term. Quite to the contrary, the court in *People* v. *Jackson, supra,* 218 Cal.App.3d 1493, 1503 stated: "As used in section 11379.6, subdivision (a), the words 'manufactures,' 'produces' and 'processes' do not have separate technical meanings apart from those attributed to them in general usage." Indeed, defendant never explains, if his statement did not mean he was aware drugs were being "manufactured" as the term is used in section 11379.6, what it did mean.

Finally, there was abundant circumstantial evidence that manufacturing was occurring. This evidence included the otherwise unexplained presence of laboratory equipment, a drug reference book, chemical notations, and pay-and-owe sheets at a purported janitorial business. Defendant argues the only potentially substantial evidence of manufacturing "apart from the equipment and supplies found at the business," was the residue determined to contain methamphetamine. Defendant does not explain why we should only determine the sufficiency of the evidence "apart from" the circumstantial evidence consisting of the equipment and supplies. On the contrary, we consider " ' "the *whole record* in the light most favorable to the judgment." ' " (*People* v. *Hill* (1998) 17 Cal.4th 800, 848 [72 Cal.Rptr.2d 656, 952 P.2d 673], italics added.) On that basis, we find the evidence to be sufficient.

B.  *Instruction That Methamphetamine Manufacturing Encompasses All Stages of Production*

At the request of the prosecution, the court instructed: "The conduct proscribed by Health and Safety Code Section 11379.6 encompasses the initial and intermediate steps carried out to manufacture, produce or process

a controlled substance." Counsel for defendant acknowledged the instruction was a correct statement of law.[4] On appeal, however, defendant argues the instruction was erroneous, based essentially on his argument, discussed *ante*, that the crime of manufacturing requires that the final stage of the production process has been reached. Since we have rejected that argument, we conclude the instruction properly stated the law.

C.  *Sufficiency of Evidence Defendant Aided and Abetted Manufacture of Methamphetamine*

██  The prosecution proceeded against defendant for manufacturing methamphetamine on a theory of aiding and abetting. Defendant argues the evidence was insufficient because an aider and abettor must assist in the crime before or during its commission, and no manufacturing of methamphetamine was actually taking place when defendant was apprehended at the premises. He asserts "the offense of manufacturing methamphetamine is not being committed when no manual work or chemical interactions are occurring, and any person aiding at that point cannot be an aider and abetter [*sic*] . . . ." He contends that, at most, he "provided aid after manufacturing had ceased."

██  The Supreme Court has declared that, "in determining the duration of an offense, for the purpose of aider and abettor liability, the court must take into account the nature of the interests that the penal provision is intended to protect . . . ." (*People* v. *Montoya* (1994) 7 Cal.4th 1027, 1040 [31 Cal.Rptr.2d 128, 874 P.2d 903], citing *People* v. *Cooper* (1991) 53 Cal.3d 1158 [282 Cal.Rptr. 450, 811 P.2d 742].) Under this approach, an offense may have been "committed," so as to subject its perpetrator to liability for the completed offense as opposed to an attempt to commit it, but still remain in progress for purposes of determining aider and abettor liability. (*Montoya, supra,* at p. 1040, citing *Cooper, supra,* at p. 1164.) Thus, in *Montoya* the Supreme Court held that for purposes of aiding and abetting liability a burglary continues until the perpetrator finally departs from the structure, even though the crime is technically complete upon the initial entry. (7 Cal.4th at pp. 1045-1047.) Similarly, in *Cooper* the court held that a robbery continues for purposes of aiding and abetting until the stolen property is carried to a place of temporary safety, even though the crime is technically complete when the property is taken from the victim's person or immediate presence. (53 Cal.3d at pp. 1165-1166.)

---

[4]Suggesting or acceding to an erroneous instruction constitutes invited error if defense counsel "expresses a deliberate tactical purpose" in so doing. (*People* v. *Green* (1995) 34 Cal.App.4th 165, 177 [40 Cal.Rptr.2d 239], italics omitted.) The Attorney General does not argue that by acceding to the instruction defendant invited any error in giving it. We therefore do not address the question.

██ Defendant notes the Supreme Court has not extended the principle articulated in *Montoya* and *Cooper* beyond the crimes of burglary and robbery. In *People* v. *Lancellotti, supra,* 19 Cal.App.4th 809, however, the court took the view that the crime of manufacturing methamphetamine is an ongoing offense which remains "in progress" once the initial steps have been set in motion, even when no active manipulation of the manufacturing apparatus is taking place. As discussed *ante,* the *Lancellotti* court held there was sufficient evidence of manufacturing even though the defendant's laboratory was "boxed" in a storage locker when the police found it. The court stated the defendant was not entitled to acquittal just because his clandestine laboratory "was not 'bubbling and reacting when the police arrived . . . .' " (*Id.,* at p. 813.) It further stated that the contents of the locker, and the odor emanating from it, provided "substantial evidence that the manufacture of methamphetamine, an incremental and not instantaneous process, *was in progress.*" (*Ibid.,* italics added.) The court expressly rejected what it termed the defendant's "tidal theory of manufacturing culpability, with liability flowing in during the 'bubbling away' stages and ebbing at 'boxed' stages . . . ." (*Id.,* at p. 814.)

Although *Lancellotti* did not deal with liability for aiding and abetting, we conclude its view of a violation of Health and Safety Code section 11379.6 as an ongoing offense should apply to aiding and abetting. The obvious purpose of section 11379.6 is to deter the production of controlled substances, and thereby inhibit their distribution and use. The process of methamphetamine production can be temporarily interrupted at any stage. In fact, persons engaged in manufacturing methamphetamine frequently interrupt the process and move the apparatus to a different location in an effort to avoid detection. The purpose of the Legislature in enacting section 11379.6 would not be served by restricting aider and abettor liability to persons who render assistance only during periods when chemicals or production apparatus are being actively manipulated. Accordingly, taking into account "the nature of the interests that the penal provision is intended to protect," (*People* v. *Montoya, supra,* 7 Cal.4th 1027, 1040), we conclude defendant was properly convicted as an aider and abettor even without a showing that work was being actively performed while he was on the premises.

We also note that, even if defendant's position were correct, it would not preclude a finding of substantial evidence to support his conviction. The investigating officer, who had extensive experience investigating clandestine drug laboratories, testified that the premises had a distinctive odor associated with methamphetamine manufacture. It was reasonably inferable from the presence of this odor that the laboratory was in active operation when defendant was present.

D.-K.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## III

### DISPOSITION

The judgment is reversed as to counts 2 and 3. The finding that defendant was personally armed in the commission of count 1 is also reversed, and the matter is remanded to the trial court with directions to modify the sentence in accordance with our disposition. In all other respects, the judgment is affirmed.

McKinster, Acting P. J., and Gaut J., concurred.

---

*See footnote, *ante*, page 697.